**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**DIANA BENNETT, KIMAH BEACH, and GRACE STEAN,** individually and on behalf of all others similarly situated,

Plaintiffs,

v.

**FRONTIER AIRLINES, INC.**,

Defendant.

Case No. 1:26-cv-3159

**JURY TRIAL DEMANDED**

# CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, Diana Bennett, Kimah Beach, and Grace Stean ("Plaintiffs"), on behalf of themselves and all others similarly situated, state as follows for their consolidated class action complaint against Defendant, Frontier Airlines, Inc., ("Frontier" or "Defendant") and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.:

## INTRODUCTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Frontier is a Colorado based low-cost airline that serves "approximately 120 destinations in the U.S., Caribbean, Mexico and Central America."[1]

3. As such, Defendant stores a litany of highly sensitive personal identifiable

[1] *About Frontier*, FRONTIER, https://www.flyfrontier.com/about-us/ (last visited September 7, 2026).

information ("PII") about its current and former employees. But Defendant lost control over the data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4. On information and belief, the cybercriminal group named Scattered Lapsus$ Hunters announced it has stolen significant amounts of data from Frontier computer systems.[2] Upon information and belief, the Data Breach has impacted thousands of current and former employees.

5. Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the PII of Plaintiffs, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII—rendering it an easy target for cybercriminals.

6. Defendant continues to obfuscate the nature of the breach and the threat it posted—refusing to tell its employees how many people were impacted, how the breach happened, when it was discovered, or why Defendant delayed notifying victims that cybercriminals had gained access to their highly private information.

7. Despite the infamous cybercriminal, on information and belief, Scattered Lapsus$ Hunters taking credit for the breach, Defendant did not begin formal notification of the Breach until July 14, 2026. On information and belief, formal notification is still ongoing.

8. Defendant's failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to

---

[2] Kalum Shashi Ishara, *Law Firms Launch Investigations Into Frontier Airlines Following Data Breach Tied to Ransomware Group*, YAHOO NEWS (Jul. 13, 2026), https://uk.news.yahoo.com/law-firms-launch-investigations-frontier-220002329.html

prevent unauthorized use of their PII.

9. Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

10. In failing to adequately protect its employees' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendant violated state law and harmed an unknown number of its current and former employees.

11. Plaintiffs and the Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendant with their PII. But Defendant betrayed that trust. Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

12. Plaintiffs are former employees and are Data Breach victims having received a breach notice—attached as Exhibit A.

13. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiffs and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

14. Plaintiff, Diana Bennett, is a natural person and citizen of Colorado, where she intends to remain.

15. Plaintiff, Kimah Beach, is a natural person and citizen of Tullahoma, Tennessee, where she intends to remain.

16. Plaintiff, Grace Stean, is a natural person and citizen of Colorado, where she intends to remain.

17. Defendant, Frontier Airlines Inc., is a domestic corporation with its principal place

of business located at 4545 Airport Way, Denver, Colorado 80239.

## JURISDICTION & VENUE

18. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiffs and Defendant are citizens of different states. And there are over 100 putative Class members.

19. This Court has personal jurisdiction over Defendant because it is headquartered in Colorado, regularly conducts business in Colorado, and has sufficient minimum contacts in Colorado.

20. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

***Frontier Airlines***

21. Frontier is a Colorado based low-cost airline that serves "approximately 120 destinations in the U.S., Caribbean, Mexico and Central America."[3]

22. Frontier boasts that "we operate more than 100 A320 family aircraft and have the largest A320 neo fleet in the Americas."[4] On information and belief, Frontier accumulates highly private PII of its current and former employees.

23. In collecting and maintaining its employees' PII, Defendant agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiffs and Class

---

[3] *About Frontier*, FRONTIER, https://www.flyfrontier.com/about-us/ (last visited September 7, 2026).
[4] *Id.*

Members themselves took reasonable steps to secure their PII.

24. Indeed, Fronter promised in its Privacy Policy that "Your privacy is important to us," and that, "We at Frontier Airlines take reasonable precautions and implement reasonable measures and practices intended to protect your information. Our measures and practices are intended to protect your information against unauthorized access or erroneous disclosure[.]"[5]

25. Defendant understood the need to protect its current and former employees' PII and prioritize its data security.

26. Despite recognizing its duty to do so, on information and belief, Frontier has not implemented reasonably cybersecurity safeguards or policies to protect employees' PII or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to employees' PII.

***Frontier's Data Breach***

27. On or around May 12, 2026, and June 3, 2026, Frontier was hacked in the Data Breach.[6]

28. Worryingly, Frontier already admitted that "an unauthorized third party had accessed a Frontier data storage account containing files with certain personal information."[7]

29. Because of Frontier's Data Breach, at least the following types of PII were compromised:

a. First and last name;

---

[5] *Privacy Notice*, FRONTIER, https://www.flyfrontier.com/legal/privacy-policy/ (last visited Sept. 8, 2026).
[6] *See* Exhibit A.
[7] *Id*.

b. Address;

c. Phone number;

d. Social Security number;

e. Driver's license number;

f. Place of birth;

g. Designated contact information;

h. Passport number or visa number;

i. Date of birth; and

j. Frontier employee ID number.

30. Upon information and belief, Defendant injured at least 11,482 persons—via the exposure of their PII—in the Data Breach. Upon information and belief, these 11,482 persons include its current and former employees.

31. And yet, Defendant waited until July 9, 2026, before it began notifying the class—a full 58 days after the breach began.[8]

32. Thus, Frontier kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

33. And when Frontier did notify Plaintiffs and the Class of the Data Breach, Frontier acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiffs and the Class:

a. "remain vigilant against attempts of fraud or identity theft"

b. "which includes carefully reviewing online and financial accounts, and credit reports for suspicious activity"

---

[8] *Id.*

34. Frontier failed its duties when its inadequate security practices caused the Data Breach. In other words, Frontier's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Frontier caused widespread injury and monetary damages.

35. Since the Data Breach, Frontier claims that it "took steps to…help prevent a reoccurrence of this type of incident, including strengthening access controls, improving monitoring of [Frontier's] systems, and implementing other measures to safeguard information and enhance [Frontier's] ability to detect and respond to potential threats."[9]

36. But such simple declarations are insufficient to ensure that Plaintiffs' and Class Members' PII will be protected from additional exposure in a subsequent data breach.

37. Frontier has done little to remedy its Data Breach. True, Frontier has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiffs and Class Members for the injuries that Frontier inflicted upon them.

38. Because of Frontier's Data Breach, the sensitive PII of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

***Scattered Lapsus$ Hunters & the Dark Web***

39. Worryingly, the cybercriminals that obtained Plaintiffs' and Class Members' PII appear to be the notorious cybercriminal group "Scattered Lapsus$ Hunters."[10]

40. Scattered Lapsus$ Hunters is a hybrid threat actor group forged from there of the

---

[9] *Id.*

[10] Kalum Shashi Ishara, *Law Firms Launch Investigations Into Frontier Airlines Following Data Breach Tied to Ransomware Group*, YAHOO NEWS (Jul. 13, 2026), https://uk.news.yahoo.com/law-firms-launch-investigations-frontier-220002329.html

most notorious cybercriminal groups, including ShinyHunters, Scattered Spider, and Lapsus$.[11] Having merged in late 2025, Scattered Lapsus$ Hunters has already become one of the most active ransomware actors, and Defendant, self-proclaimed leader in its industry, knew or should have known of the tactics that groups like Scattered Lapsus$ Hunters employ.[12]

41. As explained by the global cybersecurity firm BlackFog, the modus operandi of cybercriminals like Scattered Lapsus$ Hunters is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[13]

42. On information and belief, Scattered Lapsus$ Hunters maintains a Data Leak Site ("DLS") on the dark web where it publishes stolen data in order to pressure organizations that were subject to a data breach.

43. On or around March 3, 2026, the cyberhacker "bobdahacker" released a report warning that Frontier's boarding pass was functioning as a 'skeleton key' to all of an individual's sensitive information, including their home address, email address, phone number, full date of birth, passport number, nationality, frontier loyalty membership information, financial information including credit and debit card information as well as full payment history, baggage tag number information, as well as whether the passenger was an adult or a child.[14]

---

[11] *Threat Actor Spotlight: Scattered Lapsus$ Hunters*, DARK OWL (Jan. 20, 2026) https://www.darkowl.com/blog-content/threat-actor-spotlight-scattered-lapsus-hunters/

[12] *Id.*

[13] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BlackFog (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.

[14] *Your Boarding Pass Is a Skeleton Key. Frontier Airlines Doesn't Care*, BOBDAHACKER (June 16, 2026) https://bobdahacker.com/blog/frontier-airlines-hack




*The KTN (Known Traveler Number) document. documentTypeCode "K". Full name, date of birth, gender. All in the API response.*




*Credit card details: accountNumber "XXXXXXXXXXXX7586" (last 4), expirationDate, BIN range, cardholder name, billing address including street/city/state/zip, billing email, billing IP address, authorization code, and payment amount ($609.88). All from one API call.*

44. The cyberhacker "bobdahacker" stated in its report that, despite making contact with Frontier regarding Frontier's cybersecurity vulnerabilities as early as March 3, 2026, Frontier

continued to ignore the vast majority of these vulnerabilities and failed to remedy the same. "Bobdahacker" then publicly released information about these vulnerabilities on or around June 16, 2026.

## The Reporting Timeline (A Masterclass in Being Ignored)

| Date | What |
|---|---|
| March 3 | Initial disclosure: Vulns 1 and 2 reported to Frontier |
| March 5 | Follow-up: Found Vuln 0 (PNR enumeration), reported with urgency |
| ~March | Vuln 0 fixed. Vulns 1 and 2 remain live. They sent me a model plane. Cool? |
| April 9 | Follow-up with attack chain summary |
| April 21 | Follow-up: Retested, confirmed Vulns 1 and 2 still live. Reported new Passengers/Edit finding. Raised compensation discussion |
| May 13 | Follow-up: Still live. Set 30-day disclosure deadline (June 12). Pinky promise this time |
| June 12 | Deadline passed. Frontier: 🦗 🦗 🦗 |
| June 16 | Public disclosure. 105 days. Vulns 1 and 2 still live. You're reading this |

They sent me a model plane though. So there's that.

## What's Still Live Right Now

As of June 16, 2026. Yes, really. I just checked again while writing this:

- **Vulnerability 1 (mobile API full PII dump):** STILL LIVE. Full passport numbers, home addresses, children's DOB, KTNs, credit card details. All of it.
- **Vulnerability 2 (email leak in HTML):** STILL LIVE. Full unmasked email in page source.
- **Passengers/Edit page leak:** STILL LIVE. Passport numbers, KTNs, DOB in server-rendered JSON.
- **Vulnerability 0 (PNR enumeration):** Fixed.

If you've ever flown Frontier and someone has your PNR and last name (from a boarding pass photo, a social media post, a discarded boarding pass, an airport trash can), your passport number, home address, and payment details are accessible right now. If you traveled with children, their dates of birth and full names are exposed too.

45. This indicates that Scattered Lapsus$ Hunters hacked Defendant's computer network, stole the sensitive PII contained therein, and published the stolen PII on the dark web.

46. Defendant's cyber and data security systems were completely inadequate in that it

allowed cybercriminals to obtain files containing a treasure trove of thousands of its current and former employees' highly sensitive PII.

47. Indeed, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[15]

48. Upon information and belief, the cybercriminals in question are particularly sophisticated. After all, the cybercriminals: (1) defeated the relevant data security systems, (2) gained actual access to sensitive data, and (3) successfully accessed and acquired data.

49. And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the dark web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[16]

50. On information and belief, Defendant has not made any public statements regarding Scattered Lapsus$ Hunters or whether it made a ransom payment.

51. However, even if Defendant made a ransom payment, there is no guarantee that the PII stolen in the Data Breach will be deleted.[17] The stolen PII is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[18]

52. Thus, on information and belief, Plaintiffs' and the Class's stolen PII has already

[15] John Krebs, *The dark web: What your business needs to know*, Fed. Trade Comm. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.
[16] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.
[17] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.
[18] *Id.*

been published—or will be published imminently—by cybercriminals on the dark web.

***The Data Breach was a Foreseeable Risk of Which Defendant was on Notice.***

53. It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

54. In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[19]

55. In light of recent high profile data breaches, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

56. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

57. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

58. In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks, including ransomware attacks involving data theft, because warnings were readily available and accessible

[19] *Data breaches break record in 2021*, CNET (Jan. 24, 2022), https://www.cnet.com/news/privacy/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last accessed September 4, 2023).

via the internet.

59. In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[20]

60. In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[21]

61. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[22]

62. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities

---

[20] *High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations*, FBI, available at https://www.ic3.gov/Media/Y2019/PSA191002 (last accessed September 4, 2023).
[21] *Ransomware mentioned in 1,000+ SEC filings over the past year*, ZDNET, https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed September 4, 2023).
[22] *Ransomware Guide*, U.S. CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last accessed September 4, 2023).

such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

63. In light of the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted PII of thousands of its current and former employes in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII and Defendant's type of business had cause to be particularly on guard against such an attack.

64. Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

65. Prior to the Data Breach, Defendant knew or should have known that it should have encrypted its current and former employees' Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Plaintiffs' Experience and Injuries***

*Plaintiff Dianna Bennett*

66. Plaintiff Dianna Bennett is a current or former employee of Frontier and a data breach victim. As a condition of employment with Frontier, Plaintiff provided Defendant with her PII, including her name, date of birth, contact information, Social Security number, home address, employee ID information, driver's license information, and financial information. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

67. Plaintiff Bennett is very careful about the privacy and security of her PII. She does

not knowingly transmit her PII over the internet in an unsafe manner. She is careful to store any documents containing her PII in a secure location.

68. Plaintiff Bennett provided her PII to Defendant and trusted that the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

69. Plaintiff Bennett reasonably understood that a portion of the funds derived from her employment would be used to pay for adequate cybersecurity and protection of PII.

70. Plaintiff Bennett received a Notice of Data Breach dated July 9, 2026.

71. Thus, on information and belief, Plaintiff Bennett's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

72. Through its Data Breach, Defendant compromised Plaintiff's PII.

73. Defendant deprived Plaintiff Bennett of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the Breach.

74. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Bennett's PII for theft by cybercriminals and sale on the dark web.

75. Plaintiff Bennett suffered actual injury from the exposure of her PII—which violates her rights to privacy.

76. Plaintiff Bennett suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

77. As a result of the Data Breach, Plaintiff Bennett has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data

Breach, reviewing credit card and financial account statements, changing her online account passwords, placing a credit freeze through all the three main credit bureaus, and monitoring Plaintiff's credit information.

78. Plaintiff Bennett has already spent and will continue to spend considerable time and effort monitoring his accounts to protect herself from identity theft. Plaintiff fears for her personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

79. Plaintiff Bennett is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff about the Data Breach in a timely fashion.

80. Once an individual's PII is for sale and access on the dark web, as Plaintiff Bennett's PII is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[23] On information and belief, the spam calls Plaintiff is receiving are a result of the Data Breach. Indeed, the information exposed by Defendant's Breach was more than enough for cybercriminals to use and gather additional information to send her spam calls.

81. Plaintiff Bennett has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded

---

[23] *What do Hackers do with Stolen Information*, AURA, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited May 8, 2026).

from future breaches.

*Plaintiff Kimah Beach*

82. Plaintiff Kimah Beach is a former employee of Frontier and a data breach victim. As a condition of employment with Frontier, Plaintiff provided Defendant with her PII, including her name, date of birth, contact information, Social Security number, home address, employee ID information, driver's license information, and financial information. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

83. Plaintiff Beach is very careful about the privacy and security of her PII. She does not knowingly transmit her PII over the internet in an unsafe manner. She is careful to store any documents containing her PII in a secure location.

84. Plaintiff Beach provided her PII to Defendant and trusted that the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

85. Plaintiff Beach reasonably understood that a portion of the funds derived from her employment would be used to pay for adequate cybersecurity and protection of PII.

86. Plaintiff Beach received a Notice of Data Breach dated July 9, 2026.

87. Thus, on information and belief, Plaintiff Beach's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

88. Through its Data Breach, Defendant compromised Plaintiff Beach's PII.

89. Defendant deprived Plaintiff Beach of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the Breach.

90. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Beach's PII for theft by cybercriminals and sale on the dark web.

91. Plaintiff Beach suffered actual injury from the exposure of her PII—which violates her rights to privacy.

92. Plaintiff Beach suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

93. As a result of the Data Breach, Plaintiff Beach has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing her online account passwords, placing a credit freeze through all the three main credit bureaus, and monitoring Plaintiff's credit information.

94. Plaintiff Beach has already spent and will continue to spend considerable time and effort monitoring his accounts to protect herself from identity theft. Plaintiff fears for her personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff is experiencing anxiety, distress, and fear regarding how this Data Breach, including the exposure and loss of her Social Security number, will impact her ability to do so. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

95. Plaintiff Beach is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff about the Data Breach in a

timely fashion.

96. Indeed, following the Data Breach, Plaintiff Beach has experienced a large influx of spam and scam text messages and phone calls on the same phone number that, on information and belief, Defendant possessed and that was stolen in this Data Breach. These spam texts and calls further demonstrate that Plaintiff's information was stolen in the Data Breach has been placed in the hands of cybercriminals.

97. Once an individual's PII is for sale and access on the dark web, as Plaintiff Beach's PII is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[24] On information and belief, the spam calls Plaintiff is receiving are a result of the Data Breach. Indeed, the information exposed by Defendant's Breach was more than enough for cybercriminals to use and gather additional information to send her spam calls.

98. Plaintiff Beach has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

*Plaintiff Grace Stean*

99. Plaintiff Stean is a former employee of Frontier and a data breach victim. As a condition of employment with Frontier, Plaintiff provided Defendant with her PII, including her name, date of birth, contact information, Social Security number, home address, employee ID information, driver's license information, and financial information. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

---

[24] *What do Hackers do with Stolen Information*, AURA, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited May 8, 2026).

100. Plaintiff Stean is very careful about the privacy and security of her PII. She does not knowingly transmit her PII over the internet in an unsafe manner. She is careful to store any documents containing her PII in a secure location.

101. Plaintiff Stean provided her PII to Defendant and trusted that the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

102. Plaintiff Stean reasonably understood that a portion of the funds derived from her employment would be used to pay for adequate cybersecurity and protection of PII.

103. Plaintiff Stean received a Notice of Data Breach dated July 9, 2026.

104. Thus, on information and belief, Plaintiff Stean's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

105. Through its Data Breach, Defendant compromised Plaintiff Stean's PII.

106. Defendant deprived Plaintiff Stean of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the Breach.

107. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Stean's PII for theft by cybercriminals and sale on the dark web.

108. Plaintiff Stean suffered actual injury from the exposure of her PII—which violates her rights to privacy.

109. Plaintiff Stean suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

110. As a result of the Data Breach, Plaintiff Stean has spent time and made reasonable

efforts to mitigate the impact of the Data Breach, including but not limited to changing her passwords, contacting the credit bureaus as Defendant instructed, and monitoring her financial accounts for about 2 and a half hours per week. This is more time than she spent prior to learning of the Defendant's Data Breach. Having to do this every week not only wastes her time as a result of Defendant's negligence, but it also causes her great anxiety.

111. Plaintiff Stean has already spent and will continue to spend considerable time and effort monitoring his accounts to protect herself from identity theft. Plaintiff fears for her personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. Plaintiff is experiencing anxiety, distress, and fear regarding how this Data Breach, including the exposure and loss of her Social Security number, will impact her ability to do so. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

112. Plaintiff Stean is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff about the Data Breach in a timely fashion.

113. Indeed, following the Data Breach, Plaintiff Stean has experienced a large influx of spam calls on the same phone number that, on information and belief, Defendant possessed and that was stolen in this Data Breach. These spam calls further demonstrate that Plaintiff's information was stolen in the Data Breach has been placed in the hands of cybercriminals.

114. Once an individual's PII is for sale and access on the dark web, as Plaintiff Stean's PII is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to

gather and steal even more information.[25] On information and belief, the spam calls Plaintiff is receiving are a result of the Data Breach. Indeed, the information exposed by Defendant's Breach was more than enough for cybercriminals to use and gather additional information to send her spam calls.

115. Plaintiff Stean has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

116. Plaintiffs and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

117. As a result of Defendant's failure to prevent the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiffs and the class have suffered or are at an increased risk of suffering:

a. The loss of the opportunity to control how their PII is used;

b. The diminution in value of their PII;

c. The compromise and continuing publication of their PII;

d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent

[25] *What do Hackers do with Stolen Information*, AURA, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited May 8, 2026).

researching how to prevent, detect, contest, and recover from identity theft and fraud;

f. Delay in receipt of tax refund monies;

g. Unauthorized use of stolen PII; and

h. The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

118. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

119. The value of Plaintiffs' and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

120. Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

121. It can take victims years to spot identity or PII theft, giving criminals plenty of time to use that information for cash.

122. One such example of criminals using PII for profit is the development of "Fullz" packages.

123. Cyber-criminals can cross-reference two sources of PII to marry unregulated data

available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

124. The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and members of the Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

125. Defendant disclosed the PII of Plaintiffs and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiffs and the Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

126. Defendant's failure to properly notify Plaintiffs and the Class of the Data Breach exacerbated Plaintiffs' and the Class's injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Consumers Prioritize Data Security***

127. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[26] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[27]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[28]

c. 89% of consumers stated that "I care about data privacy."[29]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[30]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[31]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[32]

***Substantially Increased Risk of Identity Theft and Fraud***

---

[26] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[27] *Id*. at 3.
[28] *Id*.
[29] *Id*. at 9.
[30] *Id*.
[31] *Id*.
[32] *Id*. at 11.

128. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

129. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

130. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

131. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

132. The "dark web" is an unindexed layer of the internet that requires special software or authentication to access.[33] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[34] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

[33] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited July 9, 2025).
[34] *Id.*

133. The unencrypted PII of Plaintiffs and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' PII.

134. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

135. In particular, the theft of Social Security numbers—in combination with other PII (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

136. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[35] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[36]

137. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even

[35] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[36] *Id.*

years later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

138. For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[37]

139. It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

140. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

141. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are

---

[37] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

often the starting point for these additional targeted attacks on the victims.

142. Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant issued in the victim's name.[38]

143. One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[39] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII with unregulated data found

[38] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[39] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

elsewhere on the internet (like phone numbers, emails, addresses, etc.).

144. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information, such as emails, phone numbers, or credit card numbers, may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

145. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[40]

146. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their PII was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

147. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts

[40] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

or misuse of existing accounts.

148. In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

149. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

150. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

151. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[41]

152. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[42]

---

[41] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[42] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

153. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Could Have Prevented the Data Breach***

154. Data breaches are preventable.[43] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[44]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[45]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures…[a]ppropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [46]

***Defendant failed to adhere to FTC guidelines.***

155. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

156. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices

---

[43] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).
[44] *Id.* at 17.
[45] *Id.* at 28.
[46] *Id.*

for business. The guidelines explain that businesses should:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

157. The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

158. The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

159. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

160. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to current and former employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

161. Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

162. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

163. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

164. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

165. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> **All individuals residing in the United States whose PII was compromised in Defendant Frontier Airlines, Inc.'s Data Breach discovered in June 2026, including all those who**

**received notice of the breach.**

166. Excluded from the Class is Defendant, their affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any of Defendant's officers or directors, any successors, and any Judge who adjudicates this case, including their staff and immediate family.

167. Plaintiffs reserve the right to amend the class definition.

a. **Numerosity**. Plaintiffs are representative of the Class, consisting of several thousand members, far too many to join in a single action;

b. **Ascertainability**. Members of the Class are readily identifiable from information in Defendant's possession, custody, and control;

c. **Typicality**. Plaintiffs' claims are typical of class claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

d. **Adequacy**. Plaintiffs will fairly and adequately protect the proposed Class's interests. Their interests do not conflict with the Class's interests, and they have retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

e. **Commonality**. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions that a class wide proceeding can answer for the Class. Indeed, it will be necessary to answer the following questions:

i. Whether Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

ii. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

iii. Whether Defendant were negligent in maintaining, protecting, and securing PII;

iv. Whether Defendant breached contract promises to safeguard Plaintiffs' and the Class's PII;

v. Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

vi. Whether the Data Breach caused Plaintiffs' and the Class's injuries;

vii. What the proper damages measure is; and

viii. Whether Plaintiffs and the Class are entitled to damages, treble damages, or injunctive relief.

168. Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

## <u>FIRST CLAIM FOR RELIEF</u>
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

169. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

170. Plaintiffs and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

171. Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

172. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

173. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs and Class Members' Sen PII.

174. Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII.

175. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

176. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

177. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an

unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

178. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

179. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

180. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

181. Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

182. Defendant breached these duties as evidenced by the Data Breach.

183. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

184. Defendant breached its duties by failing to exercise reasonable care in supervising

its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

185. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

186. Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

187. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

188. And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

189. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CLAIM FOR RELIEF
**Negligence *Per Se***
**(On Behalf of Plaintiffs and the Class)**

190. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

191. In addition to its duties under common law, Defendant had additional duties imposed by statute and regulations, including the duties under the FTC Act. The harms which occurred as a result of Defendant's failure to observe these duties, including the loss of privacy, lost time and expense, and significant risk of identity theft are the types of harm that these statutes and regulations intended to prevent.

192. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

193. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the Class Members' PII.

194. Defendant breached its respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

195. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

196. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that,

because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

197. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class Members would not have been injured.

198. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant were failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

199. Defendant's violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

200. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CLAIM FOR RELIEF**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

201. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

202. Defendant offered to employ Plaintiffs and members of the Class if, as a condition of that employment and receiving services from Defendant, Plaintiffs and members of the Class provided Defendant with their PII.

203. In turn, Defendant agreed it would not disclose the PII it collects to unauthorized persons. Defendant also promised to safeguard current and former employees' PII.

204. Plaintiffs and the members of the Class accepted Defendant's offer by providing PII to Defendant in exchange for employment with Defendant or services provided by Defendant.

205. Implicit in the parties' agreement was that Defendant would provide Plaintiffs and members of the Class with prompt and adequate notice of all unauthorized access and/or theft of

their PII.

206. Plaintiffs and the members of the Class would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

207. Defendant materially breached the contracts it had entered with Plaintiffs and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiffs and members of the Class by:

a. Failing to properly safeguard and protect Plaintiffs' and members of the Class's PII;

b. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

c. Failing to ensure the confidentiality and integrity of electronic PII that Defendant created, received, maintained, and transmitted.

208. The damages sustained by Plaintiffs and members of the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

209. Plaintiffs and members of the Class have performed under the relevant agreements, or such performance was waived by the conduct of Defendant.

210. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in

addition to its form.

211. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

212. Defendant failed to advise Plaintiffs and members of the Class of the Data Breach promptly and sufficiently.

213. In these and other ways, Defendant violated its duty of good faith and fair dealing.

214. Plaintiffs and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

215. Plaintiffs, on behalf of themselves and the Class, seek compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## FOURTH CLAIM FOR RELIEF
**Invasion of Privacy**
**(On Behalf of the Plaintiffs and the Class)**

216. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

217. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

218. Defendant owed a duty to its employees, including Plaintiffs and the Class, to keep this information confidential.

219. The disclosure (i.e., theft) of Plaintiffs' and Class Members' PII was made to the public when Defendant provided access to this information to cybercriminals.

220. Because of Defendant's disclosure, Plaintiffs' and Class Members' PII has already

been published—or will be published imminently—by cybercriminals on the Dark Web.

221. The unauthorized disclosure of Plaintiffs' and Class Members' PII to a third party is highly offensive to a reasonable person.

222. Plaintiffs' and Class Members' highly sensitive PII, including their Social Security numbers, is not of legitimate concern to the public.

223. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

224. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

225. As a proximate result of Defendant's acts and omissions, the PII of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

226. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class because their PII are still maintained by Defendant with its inadequate cybersecurity system and policies.

227. Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiffs and the

Class.

228. In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other members of the Class, also seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**PRAYER FOR RELIEF**

Plaintiffs and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as is necessary to protect the interests of Plaintiffs and the Class;

D. Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen PII;

E. Awarding Plaintiffs and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiffs and the Class leave to amend this complaint to conform to the

evidence produced at trial; and

J. Granting such other or further relief as may be appropriate under the circumstances.

**JURY DEMAND**

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: September 14, 2026

Respectfully submitted,

By: /s/ Raina C. Borrelli
Raina C. Borrelli
**STRAUSS BORELLI PLLC**
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

Laura Grace Van Note, Esq.
**COLE & VAN NOTE**
555 12th Street, Suite 2100
Oakland, California 94607
Telephone: (510) 891-9800
lvn@colevannote.com

Marc E. Edelson
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N300
Newtown, PA 18940
Telephone: (215) 867-2399
medelson@elelson-law.com

*Interim Co-Lead Counsel for Plaintiffs and Proposed Class*

**CERTIFICATE OF SERVICE**

I, Raina C. Borrelli, hereby certify that on September 14, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record via the ECF system.

DATED this 14th day of September, 2026.

STRAUSS BORRELLI PLLC

By: *_/s/ Raina C. Borrelli_*

Raina C. Borrelli
raina@straussborrelli.com
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N Michigan Avenue, Suite 1610
Chicago IL, 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109